Simon, J.
delivered the opinion of the court.
In this case, an attachment was issued at the suit of a resident of the State of Tennessee, against a citizen of the State of Arkansas. Thomas B. *640 Lee & Go., of the city of New Orleans, were made garnishees, and answered the interrogatories propounded to them by the plaintiff, as follows: 1st. That they did receive 208 bales of cotton, marked E. B., per steamer Oampté. [449] 2d. That they believe the cotton was made in the State of Arkansas, and was shipped, as the annexed bill of lading shows, by E. Britton. 3d. (After objecting to answer this interrogatory) they state, that they believe that said cotton was made on defendant’s plantation; that the Beal Estate Bank of the State of Arkansas, at Washington, in said State, owns said cotton, and that the same belongs to said bank. And 4th. That T. B. Lee & Oo. have the proceeds of said cotton in their control, and that it is sufficient to pay the claim of the plaintiff, as set forth in his petition.
On the first of May, 1840, the president and directors of the Branch of the Beal Estate Bank of the State of Arkansas, at Washington, intervened, and alleged that the attachment in this suit having been sued out against the property of Isaac M. Jones, was levied upon the proceeds of 208 bales of cotton, in the hands of T. B. Lee & Oo., by making them garnishees. That said cotton was shipped by the intervenors’ agent, E. Britton, for their use and benefit, and consigned to the house of Lee & Oo., by said Britton, (they refer to the bill of lading,) to secure the payment of a draft drawn by Jones on said Lee & Oo. for $10,201, payable at the Mew Orleans Oanal and Banking Company, due 3d of March, 1840, belonging to the intervenors, and that the proceeds of said cotton belongs to the intervenors, in virtue of the delivery to and possession of said cotton by their said agent, for the purpose of applying the same to the payment of the draft; and that, according to the laws of Arkansas, where the cotton was delivered, they are entitled to the said proceeds, and have a right to apply the same to the payment of said draft, by privilege, and in preference to plaintiff’s claim. They pray accordingly. Plaintiff answered the petition of intervention, by pleading the general issue, and denying specially the intervenors’ alleged privilege or lien on the property attached. There was judgment below in favor of the plaintiff against the defendant for $2500, and in favor of the intervenors for the proceeds of the cotton attached; and the plaintiff, after having vainly attempted to obtain a new trial, took the present appeal.
[450] The facts of the case are merely these: Plaintiff, as the surety of the defendant, paid a debt of his to the amount of $2500, balance due on a note of hand payable on the 12th of August, 1837. In August, 1839, the defendant, whose property was under seizure, made application for assistance to the Beal Estate Bank of Arkansas, and obtained the advance of a certain sum of money ($9,658), to pay the seizing creditor, whereupon the defendant executed the following instrument: “ Whereas, the Beal Estate Bank of the State of Arkansas, at the branch thereof at Washington, Arkansas, has this day advanced and paid over to me the sum of nine thousand, six hundred and fifty-eight dollar’s, and in order to secure the'prompt, e*arly and punctual payment thereof to said bank, I have granted, bargained and sold, and by these presents do grant, bargain and sell unto the said Beal Estate Bank, all of my crop of cotton raised by me at my plantation in Lost Prairie, Lafayette County, Arkansas. And I hereby agree with said bank, and bind and obligate *641 myself to pick, gin and bale said cotton crop at tbe earliest possible day, and mark tbe same in tbe name of Edwin Britton, (wbo is tbe mutual agent of myself and said bank in tbe premises,) and deliver tbe same to said Britton on tbe bank of Bed Biver, opposite to my plantation in Lost Prairie, Lafayette County, Arkansas; and tbe said Britton is to skip tbe same at my expense and charges to New Orleans, to tbe commission house of Thomas B. Lee & Co., of the city of New Orleans, to be by them sold, and the proceeds thereof to be paid over by tbe said T. B. Lee & Co. to tbe said Edwin Brit-ton, agent as aforesaid, and by him applied to tbe payment of the said sum of $9,658 aforesaid, and tbe residue, if any, to be paid over by said bank to me. In witness whereof, I have hereunto set my hand and seal, this 28th of August, 1839. (Signed) Isaac H. Jones.” Britton was tbe cashier of tbe bank. On tbe day after said instrument was executed, as a means of repaying tbe sum advanced, Jones made bis draft in favor of 'Wilson & Paup on T. B. Lee & Co. for $10,201, payable at six months, at the New Orleans Canal and Banking Company, (the amount of said draft, interest off, [451] being tbe sum so advanced by the bank of Arkansas,) which draft was indorsed by the said Wilson and Paup, and by Jones himself. In pursuance of the said agreement, about two or three weeks previous to tbe shipment, the cotton crop (208 bales) were placed by Jones on the bank of Bed Biver, marked with the initials E. B. The cashier was about tbe same time informed by Jones, that said cotton was so placed there, ready for shipment; and accordingly, on tbe 5th of March, 1840, said cashier, as accredited agent of the bank, shipped tbe same, for the specific purpose of paying tbe sum advanced. The bill of lading shows that the 208 bales of cotton wore shipped by and in tbe name of Edwin Britton, and consigned to T. B. Lee & Co. These facts are corroborated by the testimony of other witnesses, and by tbe answers of tbe garnishees to the plaintiff’s interrogatories. There is also evidence, from which it may be strongly inferred, that the plaintiff knew and approved of the arrangement between tbe defendant and the Bank of Arkansas some time before tbe cotton was shipped; that be was aware of the application of Jones to the bank, and of the assignment of the crop of cotton for tbe purpose of reimbursing tbe amount of the sum advanced; that be said be was pleased the bank had raised the money for Jones; and that one or two days previous to the attachment, plaintiff was apprised by T. B. Lee that be had received tbe cotton, and was directed by tbe cashier of tbe bank to pay the proceeds into the Oanal Bank.
Tbe first objection made to tbe intervenors’ right of recovery is that the bank had no power or authority to enter into such contract by the laws of the State of Arkansas. Tbe charter of tbe Beal Estate Bank of Arkansas is not before us, but it has been admitted that it was duly and legally incorporated by the legislature of said State; if so, as a bank, tbe institution has undoubtedly tbe power to loan money, and it is conceded, that, as anincidont thereto, it bad tbe power to take security. It is contended however that the bank could not bind itself to the obligations of conveying cotton to market, [452] and to act in tbe capacity of carriers. This objection, it seems to us is untenable : tbe appellant’s counsel appears to confound tbe means with tbe object. *642 The object of the contract was not to convey the cotton to market, but to have it sold after delivery to apply the proceeds thereof to the satisfaction of the debt which it was intended to secure; the bank was not to derive any profit from the transportation of the cotton, it was to be shipped in the name of their cashier and agent, as their property, and consigned for the purposes mentioned in the contract; and the conveying of the cotton to New Orleans, was the only means through which the bank was to obtain the full and eompióte execution of the contract. Under the admission that it was duly incorporated, and in the absence of their charter, the intervenors, as a corporation, must be presumed to have all the rights and powers as are daily exercised by all the banking institutions of the country; they may make valid contracts, obligate others and obligate themselves towards others, manage their own affairs, exercise their rights, &c.; and we are not ready to say that purchasing or advancing money upon cotton, or any other kind of property, or taking cotton in payment of or as security for their loans, subject to its being sold to be realized in money, should he considered as a violation of the rights and privileges generally granted to such corporations; nay, it is of public notoriety that certain banking institutions have for years been engaged in this kind of business; and unless it be prohibited by their charters, we can see no reason why they should not be allowed to do so for the furtherance of their interest, and particularly to afford them the means of securing their debts and of getting the reimbursement of their funds.
But it is urged that the cashier had no authority to contract for the bank: the terms of the contract show clearly that it was made for the sole benefit of the bank, and for the purpose of securing a sum of money loaned by and due to the institution; the proceeds of the cotton are to be paid over to the ■[483] bank, and when the cashier acted as the agent of said bank, the only ■consequence was that, if he had acted without authority, the institution might ■perhaps have been allowed to disavow and repudiate his acts; hut here, instead of doing so, the intervention, which is in the name of the president and directors, shows conclusively that they consider the act of their cashier as ■their own, that they recognize him as their agent, and that the stipulations contained in the contract were made for their benefit and with their appro■bation. It must consequently have the same force and effect as if it had been entered into under a special authorization or power of attorney. Moreover, the contract under consideration, does not create any new obligation on the part.of the bank, the money had already been loaned, before and independent of the said contract, the object of which, on the part of Jones, was merely to secure its reimbursement out of the proceeds of his crop.
Our next inquiry is with regard to the legal effect of the contract and of the delivery of the cotton, under the laws of Arkansas: it is admitted on all hands that the contract in question is neither a sale nor a mortgage. From its features, it appears to us to be in the nature of a pledge, with this difference however, that here the pledgee was authorized and required to sell the cotton pledged. This is not an unusual stipulation of common law pledges; before delivery, it was defeasible, but after delivery, the contract became complete, .and its effect-could-not be destroyed by any act of the debtor or by any sub *643 sequent proceedings of the pledgor’s creditors. It is one of those - contracts which are daily resorted to for the convenience of commerce, and which take their effect only from the delivery of the property transferred or pledged for the security of the debt. Delivery is essential to its validity; and Mr. Pike, a member of the bar of the State of Arkansas, states in his testimony, that he understands the law of said State to he that éven a parol agreement or contract for such a purpose, followed up with a delivery or transfer of the property is legal and binding on the parties thereto; and on third persons; [454] and entitles such creditor to be paid by preference out of such property to any subsequent attaching creditor of said debtor, if transferred for a bona fide debt.
One of the material distinctions between a pledge and a mortgage is, that a pledge is a deposit of goods redeemable on certain terms, and either with or without a fixed period for redemption. 4 Kent’s Oom. 132. A pledge is defined to be a bailment or delivery of goods by a debtor to Ms creditor, to be kept till the debt be discharged. 2 Kent, 449; Story on Bailment, No. 286. "Where no time is limited for the redemption, the creditor may call upon the pledgor to redeem, and this, under the common law, he may do, after the debt is due, by having a judicial sale under a decree of foreclosure, or ho may sell without judicial process upon giving reasonable notice to the debtor to redeem. 2 Kent, 452; Story, p. 207, sects. 308, 310. In the present case, the pledgor may be fairly considered as having waived his right to notice by his consenting that the cotton should be sold to satisfy the debt for which it had been pledged, and by thus limiting his right of redemption to his paying the debt previous to the sale of the cotton. Story, sect. 317, says: “ In speaking of sales by the pawnee, it has been assumed that there is no special agreement between the parties, as to the time or mode of sale existing, nor any stipulation wholly interdicting any sale. If such an agreement should exist, it must ordinarily regulate the rights of both parties ; and neither of them will be allowed to depart from it with impunity.” This shows clearly that the parties may, by a special agreement, stipulate as to the time and mode of sale, that such an agreement must then regulate their rights, and that it is only in the absence of any such agreement, that the pledgee has to resort to the election of the two remedies pointed out by law to obtain satisfaction of his debt by a judicial sale under a decree of foreclosure or by a sale made after notice given to the debtor to redeem. We agree with the appellees’ counsel that the contract under consideration partakes both of the features and character of a pledge and of an assignment in trust, which, as Mr. Pike says, are two of [455] the three modes known to the common law, for securing the payment of debts; and as it has not been shown to be such as to be prohibited by or in contravention of the Laws of the State of Arkansas, where the common law'prevails, we are disposed to give it the force and effect which the parties intended it should have, not only at the time of its execution, but more particularly at the time of the delivery of the cotton. This delivery is satisfactorily established by the evidence; no fraud is alleged against it; it is clear that Jones himself could not take back the property without paying the debt; and as the cotton was so delivered and consigned for the purpose of paying a specific *644 debt; the mtervenors had thereby acquired upon it, within the knowledge of the plaintiff, such a lien as to entitle them to be paid by preference out of the proceeds thereof. The plaintiff had therefore no right'to attach said proceeds, further than the residue, if any, that might remain in favor of the defendant. The principles recognized in the case of Hepp v. Glover, 15 La. Rep. 465, are fully applicable to the present case.
It is therefore ordered, adjudged and decreed, that the judgment of the commercial court be affirmed, with costs.